## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CAMPAIGN LEGAL CENTER<br>1101 14th Street NW, Suite 400<br>Washington, DC 20005,<br><br>          Plaintiff,<br><br>v.<br><br>45COMMITTEE, INC.<br>P.O. Box 710993,<br>Herndon, VA, 20171,<br><br>          Defendant. | Civil Action No. _____ |

## COMPLAINT

1.      The Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30101, *et seq.* requires an organization that has the major purpose of electing a federal candidate, and that receives or spends in excess of $1,000 in a year to influence federal elections, to register as a political committee with the Federal Election Commission ("FEC") and to file periodic financial reports. Those reports serve the vital public "interest in knowing who is speaking about a candidate shortly before an election." *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

2.      Defendant 45Committee, Inc. ("45Committee"), which was named for the campaign to elect the 45th President of the United States, was created in October 2015 for the purpose of airing television advertisements opposing then-presidential candidate Hillary Clinton. In September 2016, after the Republican Party nominated Donald J. Trump, 45Committee reportedly served as a "nondisclosing vehicle" through which donors who supported Trump, but

found doing so publicly "embarrassing," could anonymously support Trump's campaign. Indeed, 45Committee reported that in the five weeks immediately preceding the 2016 presidential election, it spent more than $21 million supporting Trump and opposing Clinton. During that time, 45Committee paid to air more than 5,200 broadcast or national cable advertisements in key swing states, more than double the number aired during that time by the Republican National Committee. Internal Revenue Service ("IRS") filings further indicate that 45Committee likely spent far more to influence the 2016 election than the $21 million it reported. In fact, IRS documents suggest 45Committee spent as much as $38 million on the 2016 election, approximately 84% of its total spending during the entire 2016 tax year. Further reflecting the group's focus on the 2016 election, every one of 45Committee's public statements on Facebook or Twitter in 2016 either supported the election of Trump or opposed Clinton.

3.      Yet 45Committee has not registered with the FEC as a political committee. In failing to do so, Defendant has violated and continues to violate federal law, causing harm to Plaintiff Campaign Legal Center ("CLC"), and the electorate at large, by concealing critical information about its sources of funding and the recipients of its spending in support of then-candidate Trump. That concealment continues today.

4.      In August 2018, CLC filed an administrative complaint alerting the FEC to these violations, but the FEC has failed to act on the matter for more than three years. On November 8, 2021, a court in this District found that the FEC's failure to act on CLC's administrative complaint was contrary to law and ordered the FEC to act on CLC's administrative complaint within 30 days. *Campaign Legal Center v. FEC*, No. 20-cv-0809-ABJ (D.D.C. Nov. 8, 2021), ECF Nos. 24-25. The FEC did not act. On April 21, 2022, the Court issued an order declaring that the FEC failed to conform to the November 8 Order and recognizing CLC's right to initiate this lawsuit against

45Committee under 52 U.S.C. § 30109(a)(8)(C). Order, *Campaign Legal Ctr. v. FEC*, No. 20-cv-0809-ABJ (D.D.C. Apr. 21, 2022), ECF 32 at 4-5.

5.      Plaintiff CLC brings this action under 52 U.S.C. § 30109(a)(8)(C), to remedy Defendant's violations of FECA's registration and reporting requirements for political committees, 52 U.S.C. §§ 30102-30104.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 52 U.S.C. § 30109(a)(8)(C) and 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over Defendant 45Committee, which transacts business within the District of Columbia, including the filing of campaign finance reports with the FEC, pursuant to D.C. Official Code § 13-423. *See also* Fed. R. Civ. P. 4(k).

8.      Venue lies in this district under 28 U.S.C. § 1391(b)(1), (2), (c)(2).

9.      This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, and 52 U.S.C. § 30109(a).

## THE PARTIES

10.     Plaintiff Campaign Legal Center is a nonpartisan, nonprofit organization that works to strengthen American democracy through legal advocacy at the federal, state, and local levels, and to ensure that the public at large has access to critical information regarding the financing of U.S. election campaigns.

11.     As part of this work, CLC conducts research, publishes reports and articles, and regularly provides expert legal analysis to the media. CLC also litigates campaign finance matters throughout the country; files administrative complaints with the FEC to seek enforcement action against individuals and organizations that violate the law; participates in rulemakings and advisory

opinion proceedings before the FEC to ensure that the Commission is properly interpreting and enforcing federal campaign finance laws; and advocates for legislative reform measures at the federal, state, and local levels of government.

12.     CLC relies on the accurate, timely, and complete reporting of campaign finance information to carry out activities central to its mission, including producing reports and other materials to inform the public about campaign spending and the true sources and scope of candidates' financial support. These activities are obstructed when information that is subject to mandatory disclosure under FECA is not publicly available.

13.     CLC expends significant resources assisting members of the media in their investigations into candidates' financial support and their relationships with donors, so that the public is fully equipped with the information necessary to evaluate candidates and political messaging, and to cast informed votes on Election Day.

14.     CLC also uses its analyses of federal campaign finance data to support its administrative practice before the FEC and state campaign finance agencies, and to defend campaign finance laws in its active docket in federal and state courts.

15.     Defendant 45Committee, Inc. is a social welfare organization exempt from income tax under Section 501(c)(4) of the Internal Revenue Code.[1]

16.     Defendant has voluntarily appeared twice in this District to oppose Plaintiff's right to bring this action. *See* Br. of Amicus Curiae by 45Committee, ECF 28-1, *Campaign Legal Center v. FEC*, No. 20-cv-809-ABJ (D.D.C. Jan. 1, 2022) (opposing CLC's motion for order declaring FEC had failed to conform); *see also* Compl., ECF 1, *45Committee v. FEC*, No. 1:22-cv-0052

---

[1]     *See* 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, at 1 (filed Feb. 15, 2018), https://www.documentcloud.org/documents/4390683-45Committe-2016-Form-990.html.

(Freedom of Information Act suit against FEC seeking documents related to Plaintiff's administrative complaint to defend against this suit).

## LEGAL FRAMEWORK

### *Political Committee Status Under FECA*

17.    FECA and FEC regulations establish organizational, registration, and reporting requirements for federal political committees. 52 U.S.C. §§ 30102-30104. FECA defines a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A). "Contribution" is defined to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). "Expenditure" is similarly defined to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A)(i).

18.    In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court construed FECA's definition of "political committee" to "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* at 79. In *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986), the Court invoked the "major purpose" test again in the context of assessing the campaign spending of a 501(c)(4) corporation, explaining that if an organization's election-related activities "become so extensive that the *organization's major purpose may be regarded as campaign activity*, the corporation would be classified as a political committee." *Id.* at 262 (emphasis added). In such circumstances, the Court explained, the corporation would become "subject to the obligations and restrictions

5

applicable to those groups whose primary objective is to influence political campaigns." *Id.* And in *McConnell v. FEC*, 540 U.S. 93 (2003), the Supreme Court restated the "major purpose" standard for political committee status as articulated in *Buckley*. *Id.* at 170 n.64.

19.     The FEC has explained that:

> [D]etermining political committee status under FECA, as modified by the Supreme Court, requires an analysis of both an organization's specific conduct—whether it received $1,000 in contributions or made $1,000 in expenditures—as well as its overall conduct—whether its major purpose is Federal campaign activity (*i.e.*, the nomination or election of a Federal candidate).

Supplemental Explanation and Justification on Political Committee Status, 72 Fed. Reg. 5597 (Feb. 7, 2007).

20.     Relevant evidence of an organization's major purpose "may reach well beyond publicly available advertisements." *Id.* at 5601. An organization's total spending, public statements, communications with donors, and fundraising appeals are all pertinent to determining whether the organization has the "major purpose" of supporting or opposing the nomination or election of federal candidates. *Id.*; *see FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004); *FEC v. GOPAC, Inc.*, 917 F. Supp. 851, 859 (D.D.C. 1996); FEC Advisory Op. 2006-20, at 4-5 (Unity 08). Likewise relevant are "statements by the organization that characterize its activities and purposes." Supplemental Explanation and Justification on Political Committee Status, 72 Fed. Reg. at 5601.

21.     There is a two-prong test used to determine political committee status under federal election law: (1) whether an organization has received "contributions" or made "expenditures" in excess of $1,000 in a calendar year, and, if so, (2) whether the organization's "major purpose" is the "nomination or election of a candidate," as required by *Buckley*.

22.     An organization that meets the definition of "political committee" under the two-prong analysis must file a statement of organization with the FEC, 52 U.S.C. § 30103, 11 C.F.R. § 102.1(d); adhere to the organizational and recordkeeping requirements of 52 U.S.C. § 30102 and 11 C.F.R. §§ 102.7, 102.9; and file periodic reports of its contributions, expenditures, and debts with the FEC, 52 U.S.C. § 30104; 11 C.F.R. §§ 104.1, 104.3-104.5, 104.8, 104.9, 104.11-13.[2]

23.     The periodic reports that a political committee files with the FEC must publicly disclose information about the committee's contributions and expenditures, including the identity of any donor who has contributed in excess of $200 to the committee within the calendar year. 52 U.S.C. § 30104(b)(3)(A); *see also* 11 C.F.R. § 104.3(a)(4). Courts have repeatedly recognized the importance of campaign finance disclosure in informing the electorate about sources of political speech. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 369 (2010) ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election."); *Stop This Insanity Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10, 16 (D.C. Cir. 2014) (emphasizing the "First Amendment rights of the public to know the identity of those who seek to influence their vote"); *Citizens for Responsibility and Ethics in Washington v. FEC*, 209 F. Supp. 3d 77, 81 (D.D.C. 2016) ("[D]isclosure 'open[s] the basic process of our federal election[s] to public view,' . . . by 'provid[ing] the electorate with information' concerning the sources and outlets for campaign money" (internal citations omitted)).

---

[2]     In addition, a "political committee" that makes contributions to federal candidates, including in-kind contributions or coordinated communications, is subject to limits on the contributions it receives, 52 U.S.C. § 30116(a)(1), (a)(2), (f), and may not accept contributions from corporations, *id.* § 30118(a). The FEC has concluded that a political committee that "intends to make only independent expenditures" and "will not make any monetary or in-kind contributions to any other political committee or organization" is not subject to FECA's contribution limits. FEC Advisory Op. 2010-11, at 2 (Commonsense Ten).

24.     Once an entity becomes a political committee, it remains one until its status as a political committee has been terminated pursuant to 52 U.S.C. § 30103(d)(1). Under that provision of FECA, an entity seeking to terminate its status as a political committee must, *inter alia*, "file[] a written statement" with the FEC indicating "that it will no longer receive any contributions or make any disbursement and that such committee has no outstanding debts or obligations." 52 U.S.C. § 30103(d)(1); *see also* 11 C.F.R. § 102.3(a)(1).

### *Private Right of Action Under FECA*

25.     Any person who believes there has been a violation of FECA may file a sworn complaint with the FEC pursuant to 52 U.S.C. § 30109(a)(1). If the FEC fails to act on the complaint within 120 days, the administrative complainant may file a civil action against the FEC, and "the court may declare that . . . the failure to act is contrary to law, and may direct the Commission to conform with such declaration." 52 U.S.C. § 30109(a)(8)(C).

26.     If the FEC fails to conform to an order declaring its failure to act is contrary to law, FECA provides that "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

### FACTUAL BACKGROUND

27.     On October 27, 2015, the *Wall Street Journal* reported that "[a] collection of top GOP operatives, financed by prominent Republican donors, is launching two new groups to take aim at Democratic presidential frontrunner Hillary Clinton."[3] As the *Journal* described:

> The groups—Future45, a super PAC, and 45Committee, an issue-advocacy organization—are designed to seize on issues that emerge in the campaign or comments Mrs. Clinton makes and quickly assemble ads that will run both online

---

[3] *See* Patrick O'Connor & Rebecca Ballhaus, *New GOP Groups Taking Aim at Hillary Clinton*, Wall St. J. (Oct. 27, 2015), https://www.wsj.com/articles/prominent-gop-donors-launch-new-groups-to-take-aim-at-hillary-clinton-1445984161.

and on television. Organizers are hoping the groups will become something of an experimental, quick-strike vehicle to see what messages and tactics work.

. . . .

Future45 and the 45Committee, both references to the numerical ranking of the next president, enter the fray as Mrs. Clinton regains her perch as the clear favorite to be the next Democratic presidential nominee.[4]

28.     In the 2015 tax year—from April 1, 2015 to March 31, 2016—45Committee raised only $2,225,000 and spent $1,008,489.[5]

29.     After remaining "largely dormant" during the Republican primary, 45Committee was reportedly taken over in September 2016—just several weeks before the 2016 election—by Todd Ricketts, heir to the TD Ameritrade fortune[6] who would later become the Republican National Committee's finance chairman.[7] Ricketts took control of 45Committee "with the intention of running pro-Trump ads," and "began making calls seeking support from fellow mega-donors," *POLITICO* reported.[8]   *POLITICO* further reported that Ricketts was "making a particular effort to win over donors who want to help Trump but are leery of having their names publicly associated with the polarizing Republican nominee."[9] *POLITICO* quoted "a fundraiser who is familiar with—but not connected to—Ricketts' fundraising effort," who said, "There is a substantial appetite for a nondisclosing vehicle, because it's embarrassing to support Trump . . . .

---

[4] *Id.*

[5] 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, *supra* note 1, at 1.

[6] Kenneth P. Vogel, *Secret money to boost Trump*, POLITICO (Sept. 28, 2016), https://www.politico.com/story/2016/09/secret-money-to-boost-trump-228817.

[7] Jessica Taylor, *Chicago Cubs Co-Owner Todd Ricketts Named New RNC Finance Chairman*, NPR (Jan. 31, 2018), https://www.npr.org/2018/01/31/582262824/chicago-cubs-co-owner-todd-ricketts-named-new-rnc-finance-chairman.

[8] Vogel, *supra* note 6.

[9] *Id.*

There are more donors who are willing to support Donald anonymously than with their names on it."[10]

30.    On October 1, 2016, CNN reported that:

The Ricketts family, the founder and heirs to the TD Ameritrade fortune, have told associates that the Adelsons has [sic] pledged $25 million to their groups, which includes a revived super PAC, Future 45, and the nonprofit 501(c)(4) group, 45Committee. It is unclear how the Adelsons plan to split their checks between the entities.

And two people who have spoken personally with Todd Ricketts this week said Ricketts said he now had $35 million in the bank thanks to the Adelson donation and was working toward raising $70 million, earmarked exclusively for the presidential race.[11]

31.    On October 6, 2016, the *New York Times* reported that 45Committee "will begin airing ads criticizing Hillary Clinton and praising Donald J. Trump as the 2016 election enters its final weeks," and that 45Committee's president, Brian Baker, described "[t]he ads [as] part of a multimillion-dollar spending effort in battleground states."[12] The *Times* quoted Baker's support for Trump's election and opposition to Clinton's election:

"It will take a builder and a proven job creator to get Americans working again," Mr. Baker said. "As we all know, after 40 years in political life, Secretary Clinton is not the change our country needs — in fact, it is no change at all."[13]

32.    In fewer than five weeks immediately preceding the 2016 presidential election— from October 4 to November 5, 2016—45Committee reported spending $21,339,015 on

---

[10] *Id.*

[11] Theodore Schleifer, *Trump finally hits the big-money jackpot*, CNN (Oct. 1, 2016), https://www.cnn.com/2016/10/01/politics/donald-trump-big-money-success/index.html.

[12] Maggie Haberman, *Pro-Trump Group to Release Ads as Part of Major Swing State Effort*, N.Y. Times (Oct. 6, 2016), https://www.nytimes.com/2016/10/07/us/politics/campaign-ads.html.

[13] *Id.*

independent expenditures opposing Clinton or supporting Trump.[14] An "independent expenditure" is a payment (1) made for "expressly advocating the election or defeat of a clearly identified candidate" and (2) that "is not made in concert or cooperation with or at the request or suggestion of such candidate," a political committee, or their agents. 52 U.S.C. § 30101(17).

33.     45Committee also reported spending $671,320 during the October 4 to November 5, 2016 time period on electioneering communications that aired on October 27, 2016, opposing Florida U.S. Senate candidate Patrick Murphy.[15] "Electioneering Communications" are television advertisements that air within sixty days of a federal election, clearly identify a candidate running for federal office, and target the relevant electorate. 52 U.S.C. § 30104(f)(3)(A)(i).

34.     According to the Center for Public Integrity's Political Ad Tracker, 45Committee aired 5,241 broadcast spots in the second half of 2016; all ran from October 2 through November 5, 2016, and were concentrated in the swing states of Pennsylvania, North Carolina, and Florida.[16]

---

[14] 45Committee Inc., Year-End Report of Independent Expenditures Made and Contributions Received, FEC Form 5, at 3-11 (filed Jan. 31, 2017), http://docquery.fec.gov/pdf/652/201701319042382652/201701319042382652.pdf. Groups like 45Committee that are not registered as a political committee must nevertheless report to the FEC any independent expenditures of more than $250 in a calendar year.  *See* 52 U.S.C. § 30104(c).

[15] 45Committee Inc., 24 Hour Electioneering Communication Notice, FEC Form 9, at 3 (filed Oct. 28, 2016), https://docquery.fec.gov/pdf/385/201610319037011385/201610319037011385.pdf. Groups like 45Committee that are not registered as a political committee must nevertheless report to the FEC any electioneering communications aggregating in excess of $10,000 in a calendar year. *See* 52 U.S.C. § 30104(f)(1)-(2).

[16] Erika Franklin Fowler, Travis N. Ridout & Michael M. Franz, *Political Advertising in 2016: The Presidential Election as Outlier?* 14 Forum 445 (2017), https://www.degruyter.com/document/doi/10.1515/for-2016-0040/html; Al Letson, *When Mad Men Meet Dark Money*, WDET (Mar. 15, 2016), https://wdet.org/posts/2016/03/15/82665-when-mad-men-meet-dark-money/.

The tracker shows that this number exceeded the number of broadcast spots aired by the Republican National Committee.[17]

35.     45Committee's ads ran up until Election Day. For example, after the Clinton campaign challenged the veracity of a 45Committee ad and asked stations to take it down, attorneys for the law firm Clark Hill responded to the stations on behalf of 45Committee and Future 45, writing, "We trust you will make a fact-based decision and continue to air these ads in order to allow the American people to be fully educated about their candidates for President. With just one day before the election, any decision to stop airing the ad will cause irreparable harm to 45Committee and Future45."

36.     In 2016, 45Committee's Twitter account tweeted only six times. All six tweets were posted in October or November, and all pertained to the 2016 election. Specifically:

a)     On October 6, 2016, 45Committee tweeted, "A tired career politician who will increase #taxes & cost jobs, or a proven job creator who will fight for good US jobs? The choice is clear," along with 45Committee's ad titled "Same Path."[18] The ad featured multiple images of Trump and Clinton, attacked Clinton, called Trump a "proven job creator," and pictured a ballot with Trump's name illuminated.[19]

b)     On October 7, 2016, 45Committee tweeted, "It's time to make America strong again," together with the "Same Path" ad.[20]

---

[17] *Id.*

[18] @45Committee, *A tired career politician*, Twitter (Oct. 6, 2016, 4:35 PM), https://twitter.com/45_Committee/status/784129857466798080.

[19] *Id.*

[20] @45Committee, *It's time to make America strong again*, Twitter (Oct. 7, 2016, 9:22 AM), https://twitter.com/45_Committee/status/784383293772800002.

c)      Later in the day on October 7, 2016, 45Committee tweeted a longer version of the ad, which this time it titled "Strong Again," with the tweeted message, "Americans don't need 4 more years of job loss & higher taxes from a career politician. We need someone with a proven record of job creation."[21] This ad, like the shorter version, attacked Clinton, praised Trump as a "proven job creator," and showed a ballot with Trump's name illuminated, but it also concluded with a message to "Vote November 8th" (while a voiceover said, "And it starts November 8th with your vote. The time for change is right now"), followed immediately by an image of Trump.[22]

d)      On October 9, 2016, 45Committee again tweeted out the "Strong Again" ad with the message, "We need to change Washington and make America strong again. The time for change is now and it starts in November with your vote."[23]

e)      On November 6, 2016, two days before the election, 45Committee tweeted, "Stop the Clinton scandals and make America strong again," along with video of a third ad titled "Real Change."[24] After showing pictures of Clinton while telling its viewers that "America can't afford a president too distracted by their own endless scandals . . . " (among other lines), the ad concluded with an image of Trump

---

[21] @45Committee, *Americans don't need 4 more years of job loss*, Twitter (Oct. 7, 2016, 1:53 PM), https://twitter.com/45_Committee/status/784451489666174977.

[22] *Id.*

[23] @45Committee, *We need to change Washington*, Twitter (Oct. 9, 2016, 10:05 AM), https://twitter.com/45_Committee/status/785118896206454788.

[24] @45Committee, *Stop the Clinton scandals*, Twitter (Nov. 6. 2016, 10:36 AM), https://twitter.com/45_Committee/status/795288754953027586.

overlaid with the text, "Stop the Clinton Scandals. Vote for <u>Real</u> Change November 8th."[25]

    f)    Also on November 6, 2016, 45Committee tweeted a "Why Isn't Hillary Ahead?" ad along with the text, "'Why aren't I 50 points ahead, you might ask,' says Hillary Clinton. Watch the video and find out why."[26] The ad featured multiple video clips of Clinton and attacked her for not having driven a car since 1996, for making $100 million, and for being under FBI investigation.[27]

37.    On its Facebook page, 45Committee posted only once in 2016, on October 6. That post read, "A tired career politician who will increase taxes and cost jobs, or a proven job creator who will fight for good American jobs? The choice is clear. It's time to make America strong again," and included a video of the "Same Path" ad.[28]

38.    On February 15, 2018, 45Committee filed its Form 990 annual return with the IRS, for the 2016 tax year, which began on April 1, 2016 and ended on March 31, 2017.[29] 45Committee reported $46,362,986 in revenue and $45,556,334 in expenses during the tax year.[30] By contrast, in the 2015 tax year, when no national elections were held, 45Committee raised only $2,225,000 and spent $1,008,469.[31]

---

[25] *Id.*

[26] @45Committee, *"Why aren't I 50 points ahead,"* Twitter (Nov. 6, 2016, 1:30 PM), https://twitter.com/45_Committee/status/795332438398373888.

[27] *Id.*

[28] 45Committee, *A tired career politician*, Facebook (Oct. 6, 2016), https://www.facebook.com/45Committee/videos/353576058317537/.

[29] 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, *supra* note 1, at 1.

[30] *Id.*

[31] *Id.*

39.     Given the figures in its Form 990, the $22,010,335 that 45Committee spent on independent expenditures and electioneering communications in the weeks before the 2016 election at least 48.3% during the 2016 *tax* year (April 2016 through March 2017).

40.     45Committee's election-related disbursements likely amounted to an even higher percentage of its overall spending during the 2016 *calendar* year. 45Committee reportedly made an estimated $4 million of its $45.5 million in spending for tax year 2016 in the first several weeks of 2017.[32] Thus, unless 45Committee engaged in significant non-campaign spending in January through March of 2016, it appears 45Committee's total expenses in calendar year 2016 were only $41.5 million, increasing the $22 million it reported disbursing on campaign spending to 53% of its total spending.[33]

41.     45Committee's annual return filed with the IRS suggests it may have engaged in additional spending intended to support the nomination or election of a candidate in the 2016 election. In Part VII, Section B of its annual return, 45Committee reported a total of $38.3 million in payments—approximately 84% of its total expenditures in tax year 2016—to "independent contractors" for what it described as "media ads services."[34] Four out of the five firms were the same vendors that 45Committee had reported to the Commission as having produced or placed its independent expenditures and electioneering communications:

a)      On its reports filed with the Commission, 45Committee reported paying $15.6 million to the firm Del Cielo Media LLC for independent expenditures (in the form

---

[32] Tom LoBianco, *First on CNN: Pro-Trump Group Hacked, Website Taken Down in Cabinet Fight*, CNN (Feb. 6, 2017), https://www.cnn.com/2017/02/06/politics/45-committee-website-hacked/index.html.

[33] *See* 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, *supra* note 1, at 1.

[34] *Id.* at 8.

of four "media placements"),[35] but its annual return filed with the IRS shows that it

paid Del Cielo Media LLC $17.4 million. On its website, Del Cielo Media describes

the various "media buying services" it provides for "your election" and "your

campaign."[36] According to a May 2017 piece on *Campaign & Elections*, Del Cielo

Media is a "venture focusing on PACs" headed by "GOP media buyer Paul

Winn."[37]

b)   On its reports filed with the Commission, 45Committee reported paying $420,493

to Connell Donatelli Inc. for independent expenditures (two "media placements"),[38]

but reported paying the firm a total of $10.3 million on its annual return filed with

the IRS. Connell Donatelli which has offices in Washington D.C.,[39] describes itself

as "a digital advertising firm to serve conservative candidates and causes."[40]

c)   On its reports filed with the Commission, 45Committee reported paying $4.6

million to the Washington D.C. based firm DDC for independent expenditures (in

---

[35] 45Committee Inc., Year-End Report of Independent Expenditures, *supra* note 14, at 3, 4, 8, 10.

[36] *About*, Del Cielo Media, http://delcielomedia.com/about.html (last visited Dec. 2, 2021).

[37] Sean J. Miller, *Consultants Grapple with Early Vote Ad Strategy*, Campaigns & Elections (May 22, 2017), https://www.campaignsandelections.com/campaign-insider/consultants-grapple-with-early-vote-ad-strategy.

[38] 45Committee Inc., Year-End Report of Independent Expenditures, *supra* note 14, at 4.

[39] Becki Donatelli, President and CEO CDI Ads, https://www.cdiads.com/strategists/beckidonatelli/ ("She splits her time between the DC and west coast offices").

[40] *About CDI*, Connell Donatelli, https://www.cdiads.com/about/ (last visited Dec. 7, 2021).

the form of eight "media placements"),[41] but its annual IRS return shows it paid the firm a total of $6.1 million over the tax year.[42]

d)  On its reports filed with the Commission, 45Committee reported it paid Mentzer Media Services $663,320 for "media placement" for its electioneering communications,[43] but its annual IRS return shows it paid the firm $3.8 million over the tax year. Mentzer Media emphasizes that it "has been helping clients win elections and campaigns through targeted media buys since 1991" and touts its "combined 82 years of political media buying experience."[44] In a 2012 piece on Mentzer, the *Washington Post* described the firm as "the top of the small-but-critical campaign sub-specialty of media buying."[45]

42.  A substantial portion of the $37.6 million paid to these four political consulting firms for "media ads services" appear to have been election-related for purposes of the major purpose test, given the timing of 45Committee's ads, and the fact that the payments are to the same vendors as produced its other election-related communications.

43.  As its name suggests, 45Committee's public statements, fundraising strategy, and advertising campaigns demonstrate that it had the "major purpose" of electing candidate Trump to become the 45th President of the United States in the 2016 election.

---

[41] 45Committee Inc., Year-End Report of Independent Expenditures, *supra* note 14, at 5, 6, 7, 9.

[42] 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, *supra* note 1, at 8.

[43] 45Committee Inc., 24 Hour Electioneering Communication Notice, *supra* note 15, at 3.

[44] *About Us*, Mentzer Media, http://www.mentzermedia.com/ (last visited Dec. 2, 2021).

[45] Bill Turque, *Master of the art of the media buy*, Wash. Post (Sept. 5, 2012), https://www.washingtonpost.com/politics/master-of-the-art-of-the-media-buy/2012/09/05/f47a8f9c-f761-11e1-8b93-c4f4ab1c8d13_story.html?utm_term=.e2fe6ed483f1.

## ADMINISTRATIVE PROCEEDINGS & PROCEDURAL HISTORY

44.     On August 23, 2018, CLC filed an administrative complaint with the FEC, alleging that 45Committee had violated 52 U.S.C. §§ 30102-30104 by failing to register as a federal political committee and file reports of its contribution and expenditure activity, as required by FECA.[46] *See* Ex. A.

45.     On August 29, 2018, the FEC sent CLC a letter acknowledging the receipt of the administrative complaint and designating it Matter Under Review No. 7486. Despite the substantial evidence in CLC's administrative complaint demonstrating that 45Committee violated FECA, there is no indication that the FEC has taken action on the matter.

46.     On March 24, 2020, CLC filed a civil action against the FEC in the U.S. District Court for the District of Columbia under 52 U.S.C. § 30109(a)(8)(A), which provides Plaintiff a cause of action for "a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed." *See Campaign Legal Ctr. v. FEC*, No. 20-cv-0809-ABJ (D.D.C.), ECF No. 1.

47.     On May 28, 2020, the Clerk of the Court declared the FEC in default for failure to plead or otherwise defend the action.

48.     On November 8, 2021, the court issued a memorandum opinion and default judgment order against the FEC, finding that the agency's failure to act on CLC's administrative complaint was contrary to law and ordering the FEC to conform by acting on Plaintiff's administrative complaint within 30 days. *See Campaign Legal Center v. FEC*, No. 20-cv-0809-ABJ (D.D.C. Nov. 8, 2021), ECF Nos. 24-25.

---

[46] *See* FEC Matter Under Review No. 7486.

49.     The 30-day period for the FEC to conform to the default judgment order expired on December 8, 2021, with no action by the FEC.

50.     The next day, on December 9, 2021, CLC moved for an order declaring that the FEC had failed to comply with the court's order and granting CLC's right to pursue a remedy against 45Committee directly. Pl.'s Mot. for Order Declaring Failure to Conform to Default J., *Campaign Legal Ctr. v. FEC*, No. 20-cv-0809-ABJ (Dec. 9, 2021), ECF No. 26.

51.     On April 21, 2022, the court issued an Order declaring that the FEC "has not complied with the Court's November 8 Order within the time specified" and that CLC "may bring an action to enforce the FECA against the alleged violator pursuant to 52 U.S.C. § 30109(a)(8)(C)." Order at 6, *Campaign Legal Ctr. v. FEC*, No. 20-cv-0809-ABJ (Apr. 21, 2022), ECF 32.

52.      Plaintiff CLC now files this action under 52 U.S.C. § 30109(a)(8)(C) to remedy 45Committee's continuing violations of FECA's registration and reporting requirements and to obtain the information to which it has long been entitled.

## CAUSES OF ACTION

### I.     Failure to Organize and Register as a Political Committee in Violation of 52 U.S.C. §§ 30102, 30103 and 11 C.F.R. § 102.1(d), 102.7.

53.     Plaintiff repeats and realleges paragraphs 1-49.

54.     No later than October 2016, Defendant operated as a political committee dedicated to supporting the election of Donald J. Trump for President of the United States. It "receive[d] contributions aggregating in excess of $1,000 during a calendar year" and made "expenditures aggregating in excess of $1,000 during a calendar year," 52 U.S.C. § 30101(4)(A), and its public statements, fundraising strategy, and advertising campaigns demonstrate that it had the "major purpose" of electing candidate Trump, *Buckley*, 424 U.S. at 79.

55.     FECA and FEC regulations require federal political committees to register with the FEC within 10 days of qualifying as a political committee. 52 U.S.C. § 30103(a); 11 C.F.R. § 102.1(d). Once an entity becomes a political committee, it remains one until its status as a political committee has been terminated pursuant to 52 U.S.C. § 30103(d)(1), which requires the entity, *inter alia*, to "file[] a written statement" with the FEC indicating "that it will no longer receive any contributions or make any disbursement and that such committee has no outstanding debts or obligations." *See also* 11 C.F.R. § 102.3(a)(1).

56.     Defendant has never registered with the FEC as a political committee, nor has it ever filed a request with the FEC to terminate its status as a political committee.

57.     As such, Defendant continued to operate as a political committee through the time that CLC filed its administrative complaint on August 23, 2018 and will continue to operate as a political committee until it terminates its status pursuant to 52 U.S.C. § 30103(d)(1).

58.     By failing to organize and register as a political committee, Defendant violated and is continuing to violate FECA and FEC regulations. *See* 52 U.S.C. §§ 30102, 30103; 11 C.F.R. § 102.1(d), 102.7.

59.     Defendant's failure to register as a political committee, as required by FECA and FEC regulations, has harmed and continues to harm Plaintiff by depriving CLC of the information to which it is entitled, and which CLC uses to carry out its organizational mission, including assisting voters in evaluating candidates for public office.

**II.     Failure to File Required Reports in Violation of 52 U.S.C. § 30104 and 11 C.F.R.
§§ 104.1, 104.3-104.5, 104.8, 104.9, 104.11-104.13.**

60.     Plaintiff repeats and realleges paragraphs 1-55.

61.     As a federal political committee, Defendant is required to file periodic disclosure reports with the FEC identifying, among other information: the identity of each person who

contributed more than $200 in a year to the organization and the amount each person contributed; each political committee that made a contribution to Defendant and the amount each committee contributed; Defendant's outstanding debts and obligations; and all of its disbursements. 52 U.S.C. § 30104(a)(4), (b); *see also* 11 C.F.R. §§ 104.1, 104.3-104.5, 104.8, 104.9, 104.11-104.13.

62.     To date, Defendant has failed to file any reports with the FEC disclosing the information required by FECA and FEC regulations.

63.     By failing to file these reports and disclose the required information about its campaign activities, Defendant violated and continues to violate 52 U.S.C. § 30104 and 11 C.F.R. §§ 104.1, 104.3-104.5, 104.8, 104.9, 104.11-104.13.

64.     By failing to file these reports and disclose the information required by FECA and Commission regulations, Defendant has harmed and continues to harm CLC by depriving it of information to which it is statutorily entitled, and which CLC uses to carry out its organizational mission, including assisting voters in evaluating candidates for public office.

## <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Declare that Defendant 45Committee became a federal political committee no later than October 2016;

(2)     Order Defendant to register as a political committee with the FEC by filing the appropriate documentation;

(3)     Order Defendant to provide Plaintiff, via public filing with the FEC, with the information to which it is legally entitled under FECA and FEC regulations, including the identification of all sources of contributions that must be disclosed under the Act;

(4)     Order Defendant to file corrective reports with the FEC for each periodic report that Defendant was required, but failed to file;

(5)     Order Defendant to continue to file periodic reports as a political committee until such time that the organization lawfully terminates its political committee status with the FEC;

(6)     Assess an appropriate civil penalty against Defendant in accordance with 11 C.F.R. § 111.24, to be paid to the United States, for each violation Defendant is found to have committed;

(7)     Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(8)     Grant such other relief the Court may deem just and proper.

April 22, 2022                                 Respectfully submitted,

                                               /s/ *Molly E. Danahy*
                                               Adav Noti (DC Bar No. 490714)
                                               Kevin P. Hancock*
                                               Molly E. Danahy (DC Bar No. 1643411)
                                               Aseem Mulji (DC Bar No. 1724971)
                                               Orion de Nevers^
                                               CAMPAIGN LEGAL CENTER
                                               1101 14th Street NW, Ste. 400
                                               Washington, DC 20005
                                               (202) 736-2200
                                               anoti@campaignlegalcenter.org
                                               khancock@campaignlegalcenter.org
                                               mdanahy@campaignlegalcenter.org
                                               amulji@campaignlegalcenter.org
                                               odenevers@campaignlegalcenter.org

                                               *Counsel for Plaintiff Campaign Legal Center*

                                               *     Application   for   pro   hac   vice   admission
                                               forthcoming. Barred in the State of New York. Not
                                               admitted to the D.C. Bar. Practicing under the
                                               supervision of Adav Noti, member of the D.C. Bar.*

                                               *^   Application   for   pro   hac   vice   admission
                                               forthcoming. Barred in the State of California. Not
                                               admitted to the D.C. Bar. Practicing under the
                                               supervision of Molly Danahy, member of the D.C.
                                               Bar.*